UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO.: 1:21-CR-66-HAB |
| ) | |
| SPENCER O. ROBERSON ) | |

**OPINION AND ORDER**

Following a search of Defendant Spencer O. Roberson's ("Roberson") vehicle that uncovered a variety of drug contraband, the Government charged him with possession with intent to distribute fentanyl, a fentanyl analog, heroin, and cocaine in violation of 21 U.S.C. §841(a)(1) (ECF No. 1). Roberson now moves to suppress this evidence claiming that the search and his seizure violated the Fourth Amendment. (ECF No. 17). On May 17, 2022, the Court held an evidentiary hearing on the motion. After the filing of the transcript from that hearing, the Defendant filed an opening brief (ECF No. 25), to which the Government responded (ECF No. 27) and the Defendant replied (ECF No. 28). Because the Court determines that neither the search nor Roberson's arrest violated the Fourth Amendment, the Court will DENY the Defendant's Motion to Suppress.

**FACTUAL BACKGROUND**

A little before midnight on October 2, 2021, Fort Wayne Police Department (FWPD) officers Anthony Krock and Mark Bell were dispatched to the area of 1100 E. Lewis Street in Fort Wayne, Indiana to investigate a 911 call. (Hr'g Tr., ECF No. 26, at 12-13; 82-83). The anonymous caller had advised that he heard a female screaming for help in that area and provided a street address of 1138 Lewis Street. Both Officers Krock and Bell described this area (the Southeast quadrant) as a high-crime area, in which they respond to calls of fights, shootings, robberies, and

other crimes during their regular patrols. (Tr. at 10-12, 81). They also testified that they often observe the presence of drugs in this area.

Dispatch reported the call as a "signal 20" meaning "problem unknown." (Tr.. at 13). As Officer Krock explained, "…a problem unknown is exactly, you know, what the code is. It can be any number of things. Usually comes in from an anonymous party, and maybe a neighbor or bystander. But we usually have very little detail..." (*Id.*) When further questioned about the scope of a problem unknown call, Officer Krock testified, "the scope of a problem unknown is much larger than – could be larger than just a specific address…" (*Id.* at 55).

Officer Krock, driving a fleet vehicle that was not equipped with a vehicle in-car camera, responded to the scene within three minutes of the dispatch. (Tr. at 70). He did not activate his car lights and sirens because he was close to the dispatched area. As he arrived, he observed a white van with the door open and an occupant inside. A few moments later, the van's door closed and it drove away. Officer Krock was not suspicious of the van because he observed one of the occupants in the van, they did not appear to be in distress, and the van did not pull away quickly. (Tr. at 47-48: "They were not alerted by my presence…they didn't jump in the vehicle and take off … I saw one individual close the door, and they slowly drove away.").

Next, Officer Krock observed a gray Lexus sedan parked on the street with its lights on and engine running. He parked his police vehicle a few houses away from the address identified by the 911 caller as the possible location of the screaming woman. (*Id.* at 14). He exited his parked vehicle and proceeded in the direction of the Lexus and the house associated with the address. Around this time Officer Bell arrived on scene and also parked his police vehicle a few houses down the street. He observed the Lexus with its lights on and running.

2

Neither Officers Krock or Bell heard a woman screaming and neither knew whether the Lexus was linked to the 911 call. The officers approached the Lexus and Officer Krock called in the license plate to dispatch. Officer Bell observed that the Lexus was properly parked but "the engine was running or on and the headlights and taillights were on. There was a person seated in the vehicle." (Tr. at 94). Officer Krock approached on the sidewalk next to the Lexus and used his hand-held flashlight to illuminate the driver's compartment. (*Id.* at 19). Both officers observed a male sleeping in the driver's seat and a baggie of what appeared to them to be marijuana or "spice." (Tr. at 16-17, 85). Officer Krock also observed a hand-rolled cigarette or "blunt" in an ashtray on the center console. (*Id.*). Based on their narcotics related training the officers testified that they believed the substance in the baggie was either spice or marijuana. (*Id.* at 17-19, 85-86). The vehicle's occupant, later found to be Roberson, did not initially awaken when Officer Krock shined his flashlight inside.

While Officer Krock remained with the Lexus, Officer Bell and other responding officers tried to contact someone inside 1138 Lewis Street but did not succeed. (Tr. at 20, 96). Officer Bell then returned to the Lexus to assist Officer Krock in waking Roberson. Before he did, so, Officer Krock used his flashlight to scan the interior compartment for weapons. (*Id.* at 29). He did not see any.

At some point, Roberson woke up on his own, having apparently been alerted from another officer's flashlight who was standing at the front of the vehicle. Roberson was directed to exit the vehicle. (Tr. at 29). Officer Krock described Roberson's movements as "very slow" as he responded to commands. (*Id.* at 30). Roberson unlocked the door and turned to step out of the vehicle. He reached with his right hand towards his foot near the driver seat. (*Id.* at 30). Officer Krock told Roberson to stop reaching and exit the vehicle. Roberson complied and exited the

3

vehicle. Officer Krock performed a pat down of Roberson and felt a large bulge in one of his pockets. (*Id.* at 31). Officer Krock received permission to remove the contents from Roberson's pockets and located a large sum of money.[1] Roberson then was asked to step to the curb with another officer and wait.

Officer Krock returned to the vehicle and checked the area where Roberson had been reaching. Officer Krock located a black bag and a COVID mask on the floorboard area of the driver seat. Officer Krock opened the black bag and located a Ziploc bag containing seven small bags of narcotics and a digital scale. (Tr. at 34-36).[2] At that point, Officer Krock left the vehicle, handcuffed Roberson, and placed him under arrest. The Lexus was towed pursuant to the policy and procedures of the Fort Wayne Police Department and an inventory search of the vehicle was completed. (Gov't Ex. 7).

Based on these facts, Roberson asserts that the officers' actions violated his Fourth Amendment rights.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Reasonableness under the Fourth Amendment is tested under different levels of suspicion depending on the type of police-citizen encounter at issue. *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir. 1990). These interactions are not static events, but often progress through the various categories of encounters as the intrusiveness or length of the police activity increases. For

---

[1] Officer Bell retrieved the money from other officers and counted it. The total was $1,056.00 in United States currency.

[2] The substances in the smaller bags were field tested and weighed. They contained varying quantities of spice, cocaine, fentanyl, and heroin.

this reason, the Fourth Amendment divides police-citizen interactions into three levels, justified by correspondingly increasing levels of suspicion: (1) the consensual encounter, which may be started without any objective level of suspicion, see *Florida v. Bostick,* 501 U.S. 429, 434 (1991); (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity, *Terry v. Ohio,* 392 U.S. 1 (1968); and (3) the arrest, valid only if supported by probable cause, *Beck v. Ohio,* 379 U.S. 89, 96–97 (1964). "As this formulation makes clear, not every police encounter implicates the Fourth Amendment." *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015).

Roberson asserts that the officers violated the Fourth Amendment notions above when they approached his vehicle and initiated an encounter with him without reasonable suspicion that the Lexus was connected to the 911 call they were investigating. Although Roberson concedes the general principle that "officers may approach a willing person in a public place and ask that person questions without violating the Fourth Amendment," *United States v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004), he suggests the lines become blurred once he awoke and was asked to step out of the vehicle. At that point, he believes the encounter morphed into something different requiring at least reasonable suspicion. In response, the Government argues that the initial approach of the vehicle needn't be supported by any suspicion and, by the time Roberson awakened, the officers had obtained reasonable suspicion that he may possess illegal substances to warrant his removal from the car to keep investigating. The Court agrees.

The Seventh Circuit has explicitly found that an encounter that would otherwise be consensual is not a seizure just because the individual is seated in an automobile at the time of the encounter. *Shields*, 789 F.3d at 744 ("These principles do not change when an individual is seated in an automobile."); *United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) (holding that the

officers' presence on each side of the defendant's car, where the officers were standing with flashlights, did not "convert the encounter into a seizure because [the defendant] still could have declined to answer their questions and driven away"). Neither does the fact that the driver is asleep in the vehicle when officers approach change the encounter from consensual to a seizure. See *Long v. United States*, 847 F.3d 916, 921 (7th Cir. 2017) (officer's approach of vehicle with sleeping driver in restaurant drive-through lane is permissible and does not implicate the Fourth Amendment given the police's caretaking function); *Woods v. Vill. of Bellwood*, 502 F. Supp. 3d 1297, 1307 (N.D. Ill. 2020) ("The police are allowed to check on incapacitated people in vehicles in public places without running afoul of the Constitution."); *United States v. Banks*, 2021 WL 3486433, at *6 (N.D. Ind. June 4, 2021) (checking on the occupant of a vehicle who is asleep behind the wheel of a running vehicle, with a window down while it is raining does not implicate Fourth Amendment reasonableness concerns). Thus, the officers committed no Fourth Amendment intrusion by merely approaching the vehicle. Nor could their approach of the vehicle under any interpretation be treated as a "seizure" since Roberson was sleeping and had not submitted to any arguable show of authority by the officers — the trademark of a seizure. Whether Officer Krock was justified in asking Roberson to exit the vehicle is another matter.

An encounter that does not initially implicate the Fourth Amendment "can develop into an investigatory stop depending upon the conduct of the investigating officers." *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999). Police conduct that can convert a consensual encounter into an investigatory stop is behavior that would cause a reasonable person in the situation to no longer believe that he was free to leave. *See United States v. Hendricks*, 319 F.3d 993, 1000-01 (7th Cir. 2003) (finding that the initial consensual encounter had developed into an investigatory stop when police cars blocked in the defendant's vehicle on three sides). Roberson asserts, and the

Government does not contest, that "[t]he officers' demand of the defendant to step from the vehicle turned this into a seizure." (ECF No. 25 at 2). The Government does assert, however, that this caused no constitutional violation because the officers had "reasonable suspicion" to believe that Roberson might possess illegal contraband. Roberson disagrees. He contends that the observation of the bag of substances in plain view inside the vehicle didn't give the officers reasonable suspicion to investigate further because it was not "readily apparent" that the substances were illegal substances. True, Officer Krock testified that the substance in the bag appeared to be spice but he could not be "certain" (Tr. at 49).

But Roberson's focus on the substances alone is a red herring. "The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016). Officers do not arrive on scene divorced from their experiences or common sense. For this reason, in determining whether officers had the requisite particularized suspicion, the Court considers the totality of circumstances surrounding the officers to determine whether the variables add up to reasonable suspicion. *See, e.g.*, *United States v. Johnson,* 170 F.3d 708, 714 (1999) ("Applying the *Terry* standard, we have consistently held that reasonable suspicion is to be determined in light of the totality of the circumstances."). As the Seventh Circuit has repeatedly said, "this includes behavior that may in other circumstances be considered innocent; in other words, context matters." *Matz v. Klotka,* 769 F.3d 517, 523–24 (7th Cir. 2014).

The officers were dispatched to a high crime area at midnight to respond to a 911 call. While investigating the call, they observed a vehicle running nearby with an occupant either asleep or unconscious inside. Investigating further, they spied substances that could be illegal substances

in plain view in reach of the driver. Just as Roberson asserts the substances could have been hemp (not illegal) or a substance containing a level of THC that does not violate the law, the officers had a right to compile the facts known to them to determine whether Roberson committed a crime. This means that even if Officer Krock were uncertain about the illegality of the substance in the car, the fact that Roberson appeared "passed out" or asleep in a running vehicle, in a high-crime area, and with potentially illegal substances in plain view made it reasonable for officers to detain Roberson while they investigated further. *See United States v. Dickson*, 849 F.3d 686, 690 (7th Cir. 2017). Thus, the officers acted well within their Fourth Amendment authority to ask him to step out of the vehicle.

Next Roberson questions the justification for pat-down search of his outer clothing. "The power to conduct a[n investigative] stop does not automatically give police the power to frisk the subject for weapons." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013). Rather, the legitimacy of a frisk is a "separate inquiry." *Id.* Under that inquiry, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous. *United States v. Radford*, 39 F.4th 377, 385–87 (7th Cir. 2022); *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("For a frisk to be lawful, it must be based on reasonable suspicion that 'criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.'")(quoting *Terry*, 392 U.S. at 30). A generalized suspicion is not enough; the suspicion must rest on identifiable facts. *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013). The officer must be able to "point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *Id.*

Roberson contends there were no circumstances here to give rise to any suspicion that he was armed and dangerous or that he threatened officer safety. The Government, in turn, points to

circumstances it contends justifies the pat-down: (1) drugs found in plain view; (2) Roberson's reaching toward the floorboard of the driver's seat when asked to exit; (3) Roberson's slow movements in response to commands; and (4) his presence at night in a high-crime area. (ECF No. 27 at 9). The Government also points to the officers' testimony that from their experience the presence of drugs and guns go hand in hand. (Tr. at 10, 81-82).

As the Court views the facts, this is a closer question. Officer Krock testified that he had no concern for his safety when he first observed Roberson passed out in the vehicle. (Tr. at 56). He also observed no weapons in plain view when he shined his flashlight into the vehicle. (Tr. at 29). Although an officer must "point to specific and articulable facts" suggesting that the subject may be armed and present a risk of harm to the officer, Officer Krock was not asked at the hearing why he decided to pat-down Roberson. (Tr. 30-32). Perhaps this was an oversight; perhaps the Government believed it was obvious. Either way, it gives the Court some pause.

What saves the pat-down, but just barely, is Officer Krock's observation that Roberson reached down by the floorboard when asked to exit the vehicle. Officer Krock testified that in response to this movement, he directed him to stop reaching: "I didn't know if he was reaching for a weapon that may have been out of our view. So for his safety and ours, whatever he may have been reaching for, I just wanted to get him away from it." (Tr. at 30). This testimony imparts a concern by Officer Krock for not only his safety but for Roberson's as well. When combined with Roberson's affect, the drugs in plain view, and his own experiences and training that guns and drugs often go hand in hand, there was sufficient reasonable suspicion to justify the pat-down. *See United States v. Vaccaro*, 915 F.3d 431, 436 (7th Cir. 2019) (pat-down justified where defendant was observed reaching toward the passenger and rear seats); *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reasonable suspicion "allows officers to draw on their own experience and specialized

training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.").[3]

Finally, we arrive at the meat and potatoes of the Defendant's motion – the search of the vehicle that led to the seizure of the baggie of synthetic marijuana and blunt seen by the officers in plain view; and the discovery of the black bag on the floorboard near the seat and the host of drugs inside it. Roberson asserts that the officers lacked probable cause to conduct the warrantless search of the vehicle. Given this Court's rulings above, this argument is a non-starter.

First, the plain view exception to the warrant requirement justified the seizure of the baggie of synthetic marijuana and the blunt. "A warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'" *United States v. Schmidt*, 700 F.3d 934, 938-39 (7th Cir. 2012) (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)). All three of these requirements have been satisfied by the facts here.

This Court has already determined that the officers did not need any suspicion to approach the vehicle. Nor is there any real question that these items were in plain view. Both Officers Krock and Bell viewed the baggie and Officer Krock observed the blunt cigarette through the window of the vehicle. Roberson tries to muddy these waters by questioning the officers' testimony on this point, but the Court finds their testimony credible and reliable.

---

[3] The Government alternatively argues that the money found in Roberson's pocket would have been found under the inevitable discovery doctrine. Given this Court's conclusion that Officer Krock had reasonable suspicion to conduct the pat-down, the Court need not reach this issue.

As to the third requirement, Roberson again asserts that the incriminating character of the substances observed in plain view was not "immediately apparent" because the officers testified that they could not be sure that the substances were illegal. But in *United States v. Carmany,* 901 F.2d 76, 77 (7th Cir. 1990), the Seventh Circuit held the "immediately apparent" requirement of the plain view exception to the warrant requirement does not require "an unduly high degree of certainty as to the incriminatory character of the evidence." Rather, "[t]he character of the property must be such as to give the officers 'probable cause to associate the property with criminal activity." *Id*. For the plain view exception to the warrant requirement to apply, "[t]he facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband [...]; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, non-technical' probability that incriminating evidence is involved is all that is required." *Id*. (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983)). This standard is met here. The officers testified that from their narcotics training they identified the substances as either marijuana or synthetic marijuana. This is enough to justify their seizure under the plain view doctrine.

As for the broader search of the vehicle, the "automobile exception" to the warrant requirement "allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010); *see also United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020). When searching a vehicle, "an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." *United States v. Ross*, 456 U.S. 798, 823 (1982). "The probable cause determination

must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *Id.* at 808.

Here, once the officers viewed the marijuana or marijuana-like substances in plain view, probable cause to continue the search of the vehicle came easily. The objective facts known to the officers supported that determination. Roberson was passed out/asleep in a running vehicle – a possible sign of drug use or overdose, he was seen reaching toward the floorboard when asked to exit the vehicle, and a wad of money totaling $1,056 (potential drug proceeds) was found in his pocket. Based on these facts, officers had probable cause that contraband would be found in the vehicle. Once these objective facts established probable cause to search the vehicle, law enforcement was allowed to search "all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 1014). This included opening the black bag which could have concealed contraband. The search of the vehicle was justified by the automobile exception and did not run afoul the Fourth Amendment.

## CONCLUSION

Based on the reasoning above, the Defendant's Motion to Suppress (ECF No. 17) is DENIED.[4]

So ORDERED on September 28, 2022.

                                              s/ *Holly A. Brady*
                                              JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT COURT

---

[4] Given the Court's conclusions, it need not address the other justifications for the search offered by the Government.